UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SINA MOAYEDI, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 06-1082 (RBW) |
| ) | |
| U.S. CUSTOMS AND ) | |
| BORDER PROTECTION, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
IN SUPPORT OF HIS CROSS-MOTION FOR SUMMARY JUDGMENT**

### I.   Introduction

Plaintiff, Sina Moayedi, submits this Memorandum in opposition to Defendant's Motion for Summary Judgment.

### II.   Statement of Facts

Mr. Moayedi is president of the construction company, Montage, Inc. (Montage), 3636 16th Street, N.W., Suite AG-50, Washington, DC 20010.  See Unsworn Declaration of Sina Moayedi (Moayedi Decl.), attached hereto as Exhibit A.

Mr. Moayedi was born in 1955 in Iran.  Moayedi Decl., ¶ 2.  In 1973, Mr. Moayedi emigrated to the United States, and on March 12, 1991, he became a naturalized citizen of the United States.  *Id* at 5.

Since 1986, Montage has successfully completed numerous construction projects for the United States Government.  During that period, Montage has performed approximately $90 million in

contracts for the U.S. Department of Defense (DoD), including at the following locations: Patuxent Naval Air Station; NASA Greenbelt; FEMA, Mount Weather Station; Aberdeen Proving Grounds; Pentagon; Indian Head Naval Base; Bolling AFB; Department of Treasury Building. Moayedi Decl., ¶ 7.

Montage first entered the National Industrial Security Program on August 11, 1998, when it was issued its initial secret clearance. Moayedi Decl., ¶ 8. On May 11, 1999, the U.S. Department of State sponsored Montage for an upgrade of its clearance to top secret, and Montage was issued its interim top secret clearance on May 19, 1999. *Id.* Montage was issued a final Top Secret Facility Clearance and Safeguarding Capacity on February 25, 2002. *Id.*

In 1999, Mr. Moayedi received a secret security clearance. In 2002, he received a top secret security clearance pursuant to a government contract, which ended last year. His current security clearance level is secret. Moayedi Decl., ¶ 9.

On November 9, 2004, Mr. Moayedi was detained and questioned by U.S. Customs at Miami International Airport upon returning from a business trip to Jamaica. Moayedi Decl., ¶ 10; Defendant's Exhibit A, Bates No. 0009.

Since then, Mr. Moayedi has been detained in the process of re-entry to the United States by U.S. Customs and Border Protection (CBP) on the following dates and at the following airports: December 11, 2004, Miami International Airport; January 29, 2005, Fort Lauderdale-Hollywood International Airport; February 5, 2005, Washington Dulles International Airport; February 19, 2005, Miami International Airport; April 3, 2005, Fort Lauderdale-Hollywood International Airport; April 7, 2005, Fort Lauderdale-Hollywood International Airport; April 16, 2005, Washington Dulles

International Airport; May 1, 2005, Charlotte Douglas (NC) International Airport; May 7, 2005, Miami International Airport; May 12, 2005, Nassau (Bahamas) International Airport; May 26, 2005, Washington Dulles International Airport;

July 27, 2005, Washington Dulles International Airport; August 2, 2005, Fort Lauderdale-Hollywood International Airport; August 14, 2005, Washington Dulles International Airport; October 24, 2005, Washington Dulles International Airport; December 17, 2005, Hartsfield-Jackson Atlanta International Airport; April 6, 2006, Fort Lauderdale-Hollywood International Airport; May 7, 2006, Miami International Airport; and May 25, 2006, Fort Lauderdale-Hollywood International Airport. Moayedi Decl., ¶ 11; Defendant's Exhibit A.

On November 20, 2004, Mr. Moayedi's counsel submitted a written FOIA request on his behalf to CBP under the Act requesting access to the following records and to documents containing the following information:

- The reason(s) Mr. Moayedi was selected for search by CBP;

- Whether Mr. Moayedi is on any "watch list" or other list of persons of interest of CBP, or deserves any special attention by CBP;

- Whether CBP has been notified by any other agency or department of the United States that Mr. Moayedi is on any "watch list" or other list of persons of interest, or deserves special attention;

- Whether Mr. Moayedi's passport record or other record on file with CBP contains any notation or indication that he should be stopped and searched or that he should be treated or inspected differently from any other U.S. Citizen;

- All documents and communications by and between the CBP and any other agencies or departments of the United States concerning Items 1 through 4 above;

> !        All reports, findings or conclusions resulting from the interview and/or search of Mr. Moayedi on November 9, 2004. Compl., Exhibit A.

On January 3, 2005, CBP sent an unsigned form reply letter to Mr. Moayedi's counsel acknowledging the FOIA request and requiring Mr. Moayedi's execution of an included "Release of Records" form authorizing his attorney to receive his records and responsive information. Compl., Exhibit B. Mr. Moayedi executed that form and returned it to CBP on January 6, 2005. Compl., Exhibit C.

Subsequently, Mr. Moayedi did not receive any response or other communication from CBP. Compl., ¶ 16. Accordingly, on February 4, 2005, Mr. Moayedi's attorney wrote a letter to CBP inquiring about the status of his FOIA request and seeking an identification of the FOIA officer handling his request so that person could be contacted directly in that regard. Compl., Exhibit D.

CBP failed to respond to counsel's February 4, 2005. Compl., ¶ 18. Pursuant to 5 U.S.C. § 552 (a) (6) (A) (I), CBP was required to determine whether to comply with Plaintiff's request by December 20, 2004. Compl., ¶ 19.

However, CBP failed to issue any such determination by that date, nor did CBP invoke the provisions of 5 U.S.C. § 552 (a) (6) (B) concerning any desired extension of time to respond to Mr. Moayedi's request. Compl., ¶ 20.

Because CBP failed to comply with the time limits set forth in 5 U.S.C. § 552 (a) (6) (A) or to extend those limits under § 552 (a) (6) (B), pursuant to § 552 (a) (6) (C), Mr. Moayedi is deemed to have exhausted all administrative remedies applicable to his request. Compl., ¶ 20. On June 12, 2006, Mr. Moayedi filed the instant action.

On August 1, 2006, CBP sent a letter and copies of 24 records located as a result of its search pursuant to Mr. Moayedi's request. Defendant's Exhibits A and F. On November 9, 2006, CBP filed its Motion for Summary Judgment.

### III. Argument

**A. Standard of Review.**

The Court may grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. FRCP 56(c). The moving party bears the burden of demonstrating the absence of genuine issues of material fact. *Celotex Corp. v. Cartrett,* 477 U.S. 317, 322 (1986).

To obtain summary judgment in a FOIA action, an agency must show, viewing the facts in the light most favorable to the requester, that there is no genuine issue of material fact with regard to the agency's compliance with FOIA. *Steinberg v. U.S. Dep't of Justice,* 23 F.3d 548, 551 (D.C. Cir. 1994) (quoting *Weisberg v. U.S. Dep't of Justice,* 745 F.2d 1476, 1485 (D.C. Cir. 1984). The Court may award summary judgment solely on the information provided in an agency's affidavits or declarations when its affidavits or declarations describe "the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record not by evidence of agency bad faith." *Military Audit Project v. Casey,* 656 F.2d 724, 738 (D.C. Cir. 1981).

In a FOIA case, the government has the burden of proving compliance by showing that it produced responsive records on time, that the records do not exist, or that an exemption from

disclosure applies to the facts. 5 U.S.C. § 552(a)(4)(B); *Kronenberg v. United States Dep't of Justice,* 875 F. Supp. 861, 865 (D.D.C. 1995) ("In order for summary judgment to be appropriate in favor of the government in a FOIA case, the government must prove 'that each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from [FOIA's] inspection requirements.'") (citing *National Cable Television Ass'n v. FCC,* 479 F.2d 183, 186 (D.C. Cir. 1973)). Thus, the Court should grant summary judgment in favor of a FOIA requestor unless an agency proves that it produced all responsive records in a timely manner or demonstrated facts showing that the responsive records at issue were exempt from disclosure. In the instant case, CBP can show neither.

### B. CBP's search was inadequate as a matter of law.

FOIA requires that the agency conduct a search for responsive records using methods reasonably expected to produce the information requested. *Campbell v. U. S. Dep't of Justice*, 164 F.3d 20, 27 (D.C. Cir. 1998). The agency bears the burden of proof to show that its search was calculated to uncover all relevant documents. *Steinberg,* 23 F.3d at 551. To meet its burden, the agency may submit affidavits or declarations that explain in reasonable detail the scope and method of the agency's search. *Perry v. Black,* 684 F.2d 121 (D.C. Cir. 1982). If no documents are located during the search, the affidavit must explain why no other records system was likely to produce responsive documents. *Oglesby v. United States Dept. of the Army,* 920 F.2d 57, 68 (D.C. Cir. 1990). An agency is not required to search every record system, but it "cannot limit its search to only one record system if there are others likely to turn up the information requested." In the absence of contrary evidence, such affidavits or declarations are sufficient to demonstrate an agency's compliance with

FOIA. *Id.* at 127. If the record "leaves substantial doubt as to the sufficiency of the search, summary judgment for the agency is not proper." *Truitt v. Dep't of State,* 897 F.2d 540, 542 (D.C. Cir. 1990). *Campbell* at 28; *Oglesby* at 68.

      Mr. Moayedi asserts that the record in the instant case does indeed leave substantial doubt as to the sufficiency of CBP's search such that summary judgment is not appropriate. Dorothy Pullo, a Supervisory Program Analyst at CBP, stated that her staff conducted a search pursuant to Mr. Moayedi's request in the Treasury Enforcement Communications System (TECS), CBP's database of information on the inspection of individuals at the border. Decl., ¶¶ 1, 13. CBP's search apparently was limited to the TECS search conducted by Pullo's staff. Pullo describes TECS as "the sole interface to CBP records concerning the interactions of CBP officers with persons encountered entering the United States." *Id.* at ¶ 13. Pullo then concludes that a search of TECS would be reasonably calculated to reveal the responsive records about Mr. Moayedi. *Id.*

      Ms. Pullo avers that TECS contains the following information: "communications between agencies, any special instructions about individuals, including why a persons [*sic*] may be a 'person of interest' or deserving of special attention, the reasons why an individual was detained, and any notes resulting from the detention of an individual." Decl. at ¶ 13. However, Ms. Pullo failed to disclose that TECS also "denotes the regions, districts or offices in which hard copies and related files of the records responsive to the search terms are maintained, and locates records regarding property associated with the subject (such as aircraft, vessels, businesses, or vehicles). *Kaiser v. United States Customs Service,* 01 Civ. 2160 (RMC) (D.C. 2001).

Twenty-three of the 24 TECS records pertain to customs inspections of Mr. Moayedi upon re-entry into the United States in connection with the approximately twenty business and leisure trips that he made between November 11, 2004 and May 25, 2006.[1] Of these inspections, six occurred at Dulles International Airport serving Washington, D.C; six at Ft. Lauderdale International Airport in Florida; five at Miami International Airport; and one each at the respective international airports in Atlanta; Charlotte; and Nassau, the Bahamas. The fact that Mr. Moayedi was stopped for Customs inspections 20 times at six different airports raises serious questions about the adequacy of a records search that does not include records and files, other than those in TECS, held at the regional or district offices, where one would logically expect to find hard copies and related files responsive to the search terms.

Further, the fact that Mr. Moayedi was stopped for at least twenty Customs inspections over the course of nineteen months - less than two years - where previously he had been stopped on only one occasion, six-and-a-half years before this slew of Customs inspections began, also raises a doubt regarding the adequacy of CBP's search that is more than mere speculation. And finally, as discussed below, the fact that one of the released records shows on its face that the reason for stopping Mr. Moayedi for inspections was a "TECS LOOKOUT" is *prima facie* evidence that Mr. Moayedi had indeed been placed on some sort of "watch list." And yet, CBP's search did not locate, or disclose, a single record instructing CBP to enter the notation "TECS LOOKOUT" into Mr. Moayedi's file; nor did the search locate a single record discussing the reasons for placing a lookout on Mr. Moayedi. For these

---

[1] One record, dated April 19, 1997, appears to memorialize an encounter with an Inspections official regarding certain undeclared items. See Defendant's Exhibit A, Bates No. 0001.

8

reasons, CBP's claims that its search was adequate, that no further responsive documents were located, and that no material facts are in dispute, are utterly unsupportable.

### C. Customs improperly applied Exemption (b)(2) to redacted and withheld information.

Under FOIA, an agency is obliged to make available to the public all records that are reasonably described in a written request, and are not exempt from disclosure. 5 U.S.C. § 552(a)(3)(A), (B). CBP bears the burden of justifying its decision to withhold records or portions of records. 5 U.S.C. § 552(a)(4)(B). It must describe the records withheld, and show that the records fall within the claimed exemption. *Canning v. U.S. Dep't of Justice,* 848 F.Supp. 1037, 1043 (D.D.C. 1994).

Mr. Moayedi asserts that CBP has misused the exemption provided by § 552(b)(2) (Exemption (b)(2)) to withhold information to which he is entitled under FOIA. Exemption (b)(2) protects from disclosure materials that are "related solely to the internal personnel rules and practices of an agency." 5 U.S.C. § 552(b)(2). It applies to two categories of material: (1) internal agency matters so routine or trivial that they could not be "subject to ... a genuine and significant public interest;" and (2) internal agency matters of some public interest "where disclosure may risk circumvention" of statutes or agency regulations. *Dep't of the Air Force v. Rose,* 425 U.S. 352, 369-70 (1976); *see Crooker v. Bureau of Alcohol, Tobacco and Firearms,* 670 F.2d 1051, 1073-74 (D.C. Cir.1981). Generally, courts limit Exemption (b)(2) protection to "trivial administrative matters of no genuine public interest " ("low 2" information), and to information that, if disclosed, "may risk circumvention of agency regulation" ("high

9

2" information). *Schiller v. NLRB,* 964 F.2d 1205, 1206 (D.C. Cir. 1992); *see Schwaner v. Dep't of the Air Force,* 898 F.2d 793, 795 (D.C. Cir. 1990).

Ms. Pullo claims that information that was redacted from the 24 documents and labelled "(b)(2)" on the face of the documents included both "low 2" and "high 2" information. Pullo Decl., ¶¶ 17-18. In particular, she claims that the withheld "low 2" information:

> ... consists of administrative markings (e.g., file or tracking numbers) relating to internal agency file control systems, internal agency administrative processes ... , status queries, the identity of particular types of computer system reports, and to the key stroke and function codes of internal agency computerized property management systems. These markings are purely internal and are utilized by CBP to assist in the management and control of its mission. Pullo Decl., ¶ 18.

Ms. Pullo further characterizes information withheld as "high 2" as "predominantly internal . . . [that] does not impact, in any substantive manner, upon plaintiff." Pullo Decl., ¶ 19. Ms. Pullo states further:

> This 'high 2' information, in addition to the internal computer information mentioned above, consists of such things as the administrative procedures in regard to the operational responsibilities discussed and assigned to CBP personnel, how information was handled in an operational context by CBP enforcement officers. *Id.*

But a close examination of the fields from which information was redacted under Exemption (b)(2) belies Ms. Pullo's representations. All but the first of the 24 records contain a field named "reasons" or "reason for referral." Defendant's Exhibit A. All but the first record also contain a field named "charge." And all of the 24 records released by CBP contain a field in which agency personnel may enter comments.[2]

---

[2] In the records Bates-stamped 0002 through 0009, this field is named "comments." In Record No. 0001, the field is named "remarks." In Record Nos. 00010 through 00024, this field is named

Of the eight records that contain the "reason" field, that field is apparently left blank in only one record, Defendant's Exhibit A, Record No. 0006, while information entered under that field in the six of the records is redacted under Exemption (b)(2). However, in Record No. 0007, the "reason" field is not redacted, but rather, shows the entry "TECS LOOKOUT." This information is directly responsive to Plaintiff's Request for Information No. 2, which asks for documents containing information about whether Mr. Moayedi is on any "watch list" or other list of persons of interest. The "TECS LOOKOUT" entry is also directly responsive to Plaintiff's Request No. 4, which seeks information concerning whether Mr. Moayedi's records on file with CBP contains any notation or indication that he should be stopped and searched or that he should be treated differently from any other U.S. citizen. Moreover, the "TECS LOOKOUT" notation is consistent with the statement of a CBP official who told Mr. Moayedi, that the reason he was being detained was because the U.S. Department of State had instructed CBP to detain him. As noted above, FOIA obligates an agency to make available to the public all records that are reasonably described in a written request, and are not exempt from disclosure. 5 U.S.C. § 552(a)(3(A), (b).

Contrary to Ms. Pullo's declaration, the information in the "reason" field is not properly characterized as "low 2" information because there is nothing routine or trivial about the designation "TECS LOOKOUT." Nor can Ms. Pullo's description of high 2 information as "predominantly internal . . . [that] does not impact, in any substantive manner, upon plaintiff" properly apply to the "TECS LOOKOUT" entry because first, it goes to the very heart of the information sought by Mr. Moayedi,

---

"inspection remarks." See Defendant's Exhibit A. Throughout this Memorandum, these fields will be referred to as the "comments" field.

and second, the "TECS LOOKOUT" notation may well be the very notation that triggers the CBP detentions and interrogations. Furthermore, CBP's disclosure of the "TECS LOOKOUT" entry in Record No. 0007 is inconsistent with Ms. Pullo's claim that information withheld under Exemption (b)(2) may risk circumvention of CBP operations, or assist those attempting to violate the law and avoid detection. The redacting of all other entries in the "reason" field except for in this one record gives rise to legitimate questions of why CBP disclosed this information in Record No. 0007 and not in the remaining 20 records which show redactions under this field.

Because Record No. 0007 is *prima facie* evidence that CBP does indeed have a "watch" – a "TECS LOOKOUT" – placed on Mr. Moayedi, there is a strong likelihood rising above mere speculation that information contained in the fields named "charge" and "comments" also contain information that (I) is directly responsive to Plaintiff's requests, and (ii) does not logically fall within the scope of Exemption (b)(2), contrary to CBP's citations. In addition, CBP's inconsistent redaction of information under Exemption (b)(2) demonstrates that its explanations of the reasons for the redactions are inaccurate and overly vague.

> **D.  CBP provided neither a description of, nor a reason for withholding at least two documents relevant to the FOIA request.**

The record bearing Bate No. 0001 is a print-out of a screen from the TECS database. The first line of data at the top of this record reads "TECS II - PERSON SUBJECT DISPLAY (1 OF 3)." The parenthetical notation "(1 of 3)" clearly indicates that the whole record comprises two more screens. However, CBP did not provide copies of the two following screens to Mr. Moayedi. CBP did not

acknowledge that it withheld copies of these two additional screens, nor did it cite an exemption that would justify withholding the records.

Mr. Moayedi acknowledges that a portion of the comment at the bottom of Record No. 0001 reads "SUBSEQUENT SCREENS ARE BLANK." If this comment is indeed correct, then CBP had an obligation to describe the records and to cite an exemption to justify its action. If the statement is incorrect, and the subsequent two screens contain non-exempt information that is responsive to Mr. Moayedi's request, then CBP has failed to comply with its FOIA obligations because it did not release copies of screens 2 and 3.  In any event, these facts are material and clearly in dispute, such that CBP's Motion is inappropriate.

In sum, CBP has produced some, but clearly not all, of the documents responsive to Mr. Moayedi's FOIA request.  At least two facts support Mr. Moayedi's opposition to CBP's motion for summary judgment, and likewise his cross-motion for summary judgment.  First, CBP redacted information under Exemption (b)(2) from certain TECS records under the "reason" field, where a TECS LOOKOUT on Mr. Moayedi is noted in Record No. 0007, demonstrates that as a matter of law, CBP has either improperly withheld responsive information, or has improperly described information withheld as falling under Exemption (b)(2).  Second, CBP withheld screens 2 and 3 of the TECS record reproduced at Bates No. 1, without citing a specific exemption, shows that again that as a matter of law, CBP has either improperly withheld responsive information, or has improperly described information withheld as falling under Exemption (b)(2).

### IV. Conclusion

For the foregoing reasons, this Court should deny CBP's Motion for Summary Judgment, or in the alternative, grant Mr. Moayedi's Cross-Motion for Summary Judgment.  Mr. Moayedi also asks the Court to order CBP to conduct an appropriate search and produce all non-exempt documents responsive to Mr. Moayedi's November 20, 2004 FOIA request, to include searching all regional and district offices having jurisdiction over the CBP officials at the international airports enumerated above where Mr. Moayedi was detained and questioned from November 9, 2004 to the present; to produce all information redacted under (b)(2) and appearing in the fields labelled "reason," "reasons for referral, " "charge," and "comments;" to release or cite an exemption  for failing to release copies of screens 2 and 3 in relation to Record No. 0001; or alternatively, for an order to compel discovery; and attorneys costs and fees pursuant to FOIA § (a)(4)(E).

Respectfully submitted,

SINA MOAYEDI,

By his attorneys:

_____

Eric R. Stanco
(D.C. Bar No. 456896)
Stanco & Associates
126 C Street, N.W.
Washington, D.C. 20001
(202) 331-8822
(202) 331-9705 facsimile