UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SINA MOAYEDI, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 06-1082 (RBW) |
| ) | |
| U.S. CUSTOMS AND ) | |
| BORDER PROTECTION, ) | |
| ) | |
| Defendant. ) | |
| ) | |

### UNSWORN DECLARATION OF SINA MOAYEDI

I, Sina Moayedi, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am the Plaintiff in the above-captioned case. I make this Unsworn Declaration in support of my Opposition to the Government's Motion for Summary Judgment in this matter. I make this Declaration of my own personal knowledge and upon such matters as I am competent to testify. To the extent that the following statements are based upon information and belief, I believe them to be true.

2. I was born in Iran in 1955. In 1973, I emigrated to the United States, and enrolled in Utah State University.

3. I was graduated from Utah State University in 1973 and was awarded a Bachelor's Degree in geology.

4. In 1978, I moved to Washington, D.C., to attend Catholic University, where I earned a Master's Degree in architecture.

5. On March 12, 1991, I became a naturalized citizen of the United States. At all times material, I have held a valid U.S. passport.

6. In 1986, I co-founded a construction company, Montage, Inc. (Montage).

7. That year, Montage began performing construction contracts for the United States Government. Since then, Montage has successfully completed numerous contracts for various federal agencies and departments, including for the U.S. Department of State, U.S. Secret Service, Federal Bureau of Investigation, Federal Emergency Management Agency, U.S. Information Agency and U.S. Department of Defense (DoD). In fact, for DoD alone Montage has performed contracts totaling more than $90 million, including at the following locations: Patuxent Naval Air Station; NASA Greenbelt; Mount Weather, Virginia; Aberdeen Proving Grounds; the Pentagon; Indian Head Naval Base; Bolling AFB.

8. Montage first entered the National Industrial Security Program on August 11, 1998, when it was issued its initial secret clearance. Montage's clearance level was upgraded to top secret in May, 1999, and, in 2002, Montage earned a final Top Secret Facility Clearance and Safeguarding Capacity.

9. In 1999, I received a secret security clearance. My clearance level was upgraded to top secret in 2002, while Montage was working on several classified projects for the State Department. The last of those projects ended last year and my current security clearance level is secret.

10. On November 9, 2004, I was detained and questioned by U.S. Customs at Miami International Airport (MIA) upon returning from a business trip to Jamaica.

11. Since then, I have been detained in the process of re-entry to the United States by U.S. Customs on the following dates and at the following airports: December 11, 2004, MIA; January 29, 2005, Fort Lauderdale-Hollywood International Airport (FLL); February 5, 2005,

Washington/Dulles International (IAD); February 19, 2005, MIA; April 3, 2005, FLL; April 7, 2005, FLL; April 16, 2005, IAD; May 1, 2005, Charlotte Douglas International Airport (CLT); May 7, 2005, MIA; May 12, 2005, Nassau (Bahamas) International (NAS); May 26, 2005, IAD; July 27, 2005, IAD; August 2, 2005, FLL; August 14, 2005, IAD; October 24, 2005, IAD; December 17, 2005, Hartsfield-Jackson Atlanta International (ATL); April 6, 2006, FLL; May 7, 2006, MIA; May 25, 2006, FLL.

12. Typically, when I am stopped upon re-entry, the official at the primary station, where passport control is conducted, checks computer information on me and makes a mark on my Customs Declaration. This mark apparently instructs CBP personnel at the secondary station to detain and interrogate me. What happens next at the Customs control can vary significantly depending on the airport.

13. The CBP detentions at MIA are generally the most onerous, intimidating and humiliating. For example, on a number of the occasions during which I have been detained at MIA, I have been sent to a detention area and held there as long as an hour and a half before even being interviewed by a Customs officer. Then, once the interview is commenced it has lasted as long as a half hour.

14. On at least two occasions, CBP detentions at MIA have caused me to miss my connecting flights and left me stranded at the airport overnight. As a result, I have had to pay for hotel rooms, ground transportation, meals and exorbitant re-ticketing fees, none of which are reimbursable by the CBP, airlines or any other third party.

15. On numerous occasions, it has also been apparent that of all the persons selected for special questioning, I am the only one who is a U.S. citizen. I know this because during these

detentions, detainees' passports are placed into two piles, one for U.S. citizens, and one for citizens of all other countries. On those occasions, my passport always has been the sole passport in the pile for U.S. citizens.

16. I have repeatedly asked CBP officials who have detained me why I was being detained, and on most occasions they have refused to give me a reason. However, on one occasion, a CBP officer told me that my records showed an instruction from the U.S. Department of State to detain me.

17. That does not make any sense. The State Department certainly has no reason to investigate or detain me. Indeed, Montage was just awarded two more contracts for the construction of U.S. Embassy projects, one located in Palau an the other in the Federated States of Micronesia, and I recently finished a project at the U.S. Embassy in Kingston, Jamaica.

18. I certain would not still have my security clearance if there was a security concern nor would my company have been awarded those contracts.

I declare under the penalties of perjury this _____ day of December, 2006, that the foregoing statements are true and correct to the best of my knowledge and belief.

Sina Moayedi